UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| CHRISTINE WRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | _____ |
| PATRIOT SUBARU OF SACO, INC, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |
| | ) | |

## COMPLAINT AND JURY DEMAND

## PARTIES

1.      The Plaintiff, Christine Wright ("Ms. Wright" or the "Plaintiff"), is an adult female resident of the state of Maine, residing in Shapleigh, Maine 04076.

2.      Defendant Patriot Subaru of Saco, Inc. (the "Company" or the "Defendant") is a for-profit corporation doing business in the state of Maine.  The Company is incorporated in Maine and, upon information and belief, its principal office is located at 769 Portland Road, Saco, Maine 04072.

## JURISDICTION AND VENUE

3.      This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because Plaintiff has brought a claim pursuant to Title VII. The court may exercise supplemental jurisdiction over the Plaintiff's state law claims. 28 U.S.C. §1367.

4.      Venue is appropriate in the District of Maine as the acts or omissions giving rise to the claims in this Complaint occurred in the District of Maine.

5.      This Court has personal jurisdiction over the Company because the Company is a resident of the State of Maine, including because it is incorporated in Maine and because its principal office is located in Maine.

6.      This Court also has personal jurisdiction over the Company because the Company has engaged in and transacted business in the State of Maine, including by managing and/or operating a business in Maine and/or by employing Ms. Wright in Maine, and Ms. Wright's causes of action stem from the Company's business transactions within the State of Maine. Indeed, Ms. Wright was employed by the Company in the State of Maine, was managed and supervised by the Company in Maine, was discriminated against and harassed by the Company in Maine and was terminated by the Company in the Maine. In addition, the Company is registered with the Maine Department of the Secretary of State as a Company doing business in the state.

## STATEMENT OF FACTS

7.      In or around November 2023, Ms. Wright began employment for the Company in Saco, Maine as the Manager for the Company's Internet Team.

8.      At all relevant times, the Company employed 15 or more employees for 20 or more weeks during the preceding calendar year.

9.      Accordingly, at all relevant times, the Company was an employer under Title VII of the Civil Rights Act and the Maine Human Rights Act.

10.      At all relevant times, Ms. Wright was a qualified employee, and her performance was satisfactory.

11.      Upon hiring, Ms. Wright's supervisor was David Shoemaker ("Shoemaker"), general manager.

12. Shoemaker is a man.

13. Shortly after Ms. Wright was hired, Shoemaker began making inappropriate and sexually harassing comments to Ms. Wright.

14. For example, shortly after Ms. Wright was hired, Shoemaker told Ms. Wright he typically sleeps with all the women he hires.

15. It was clear Shoemaker was implying he would sleep with Ms. Wright.

16. Shocked, Ms. Wright raised protected concerns to Shoemaker, telling him that she would not sleep with him, and she did not appreciate the insinuation that she would sleep with him in the future.

17. Shoemaker began laughing and dismissed Ms. Wright's protected concerns.

18. Despite Ms. Wright making it clear Shoemaker's sexually harassing behavior was not welcome, Shoemaker continued, and indeed escalated, the sexually harassing behavior.

19. For example, on the days that Ms. Wright was working in the office, Shoemaker frequently made sexually harassing and objectifying comments regarding Ms. Wright, including commenting that her breasts were "large," her legs looked "great," and asserting that she "should wear dresses more often."

20. On other occasions, Shoemaker commented "Your boobs look great today," "That shirt looks great on you," and "That shirt really shows off your boobs."

21. Importantly, Ms. Wright consistently made it clear these comments were unwelcome, unwanted, and needed to stop.

22. Rather than stop his sexually harassing behavior, Shoemaker laughed at Ms. Wright's protected concerns and dismissed them

23.     Despite Ms. Wright raising protected concerns and asking for the sexually harassing comments to stop, Shoemaker continued making these and similar harassing comments throughout Ms. Wright's employment.

24.     For example, in or around January 2024, Shoemaker made increasingly harassing comments about female clients and venders that came into the Company.

25.     Indeed, Shoemaker would frequently comment on female clients' breasts and buttocks, including telling Ms. Wright how nice they looked.

26.     It was clear that Shoemaker saw women as nothing more than sexual objects and seemed to enjoy displaying this attitude publicly to Ms. Wright.

27.     Throughout this time, Shoemaker continued to sexually harass Ms. Wright, including by continuing to tell Ms. Wright how "large" her breasts were and how "great" her legs looked, despite Ms. Wright repeatedly making it clear these comments were unwelcome and otherwise raising protected concerns.

28.     Shoemaker continued to ignore Ms. Wright's protected concerns and continued to subject her to sexually harassing comments.

29.     For example, on one occasion, Shoemaker called Ms. Wright into his office and asked Ms. Wright if her "boobs got smaller when [she] lost weight or if they stayed the same size."

30.     Ms. Wright once again reiterated protected concerns and made clear she wanted the harassing comments to stop, including telling Shoemaker that this was none of his business.

31.     In or around late February 2024, two sales managers at the Company left.

32.     Given these resignations and Ms. Wright's strong performance, Ms. Wright was moved to a sales manager position.

33.     As a result of becoming a sales manager, Ms. Wright had to come into the office four days a week as opposed to the two days she was previously required to come in.

34.     Due to Ms. Wright's increased presence in the office, Shoemaker's sexually harassing comments became more frequent.

35.     Ms. Wright continued raising protected concerns about these comments, including making it clear these comments were unwelcome, unwanted, and needed to stop.

36.     Despite this, Shoemaker continued subjecting Ms. Wright to sexually harassing comments.  Indeed, Shoemaker would laugh at Ms. Wright and/or walk away when Ms. Wright raised protected concerns.

37.     In or around late February 2024, frustrated by the unending harassment in the working environment, Ms. Wright found herself frequently crying at work.

38.     Shockingly, on one occasion when Shoemaker noticed Ms. Wright was crying, Shoemaker flippantly said, "Wow I finally got to make you cry. I love when I make women cry."

39.     Ms. Wright again raised protected concerns to Shoemaker regarding his clearly discriminatory and harassing behavior.

40.     As he had repeatedly before, Shoemaker laughed at Ms. Wright and dismissed her protected concerns.

41.     In or around late March 2024, it became clear the rest of the sales team (not Ms. Wright) was underperforming.

42.     At or around this time, Ms. Wright expressed frustrations to Shoemaker regarding the sales team's performance.

43.     Shoemaker condescendingly responded by asserting, "You are a female, so you will get frustrated easily."

44.     It was clear this was a sex-based discriminatory comment, and that Shoemaker had negative biases towards Ms. Wright (and other women) because of her sex and/or because Ms. Wright would not submit to his sexually harassing advances.

45.     Also in or around March 2024, Ms. Wright began coming into to the office five days per week instead of four, which again gave Shoemaker more opportunities to sexually harass Ms. Wright.

46.     In or around April 2024, Shoemaker informed Ms. Wright that he would purposely make the finance manager cry because she was a woman, and again asserted he "loved making women cry."

47.     Ms. Wright again raised protected concerns to Shoemaker, including raising concerns that his continued (and worsening) discriminatory and harassing rhetoric was making her extremely uncomfortable.

48.     Shoemaker ignored Ms. Wright's protected concerns and again dismissed her protected concerns.

49.     Despite Ms. Wright's continued protected concerns, Shoemaker continued to sexually harass Ms. Wright, including by repeatedly making comments about her body parts, such as telling her how "large" her breast were, how "nice" her legs looked, that her boobs "look[ed] great," that her shirt "really show[ed] off [her] boobs," and telling her to "wear dresses more often."

50.     As she had repeatedly, Ms. Wright made it clear these comments were unwelcome, unwanted, and needed to stop.

51.     In or around August 2024, Adam Arens ("Arens"), who was an owner of the Company, made a new team for the upcoming opening of a new Company location, and put Ms. Wright on the operations team for the new location.

52.     Notably, Shoemaker did not make the decision to give Ms. Wright this new title.

53.     In or around late September 2024, Shoemaker's sexual harassment reached new heights.

54.     Indeed, Shoemaker informed Ms. Wright that the Company's new location, which Ms. Wright was tasked with helping to open, should only hire "attractive women." In addition, Shoemaker asserted Ms. Wright needed to "dress more attractive," and asserted that all women at the Company have sex with him eventually.

55.     Ms. Wright again raised protected concerns and opposed this harassing conduct, including by telling Shoemaker that she would never have sexual relations with him.

56.     Shoemaker appeared angry at Ms. Wright's opposition to his harassment, rejection of his sexual overtures, and expressions of protected concerns and he promptly left the room in a visibly annoyed manner.

57.     Importantly, Shoemaker's sexually harassing comments often were made in front of other managers and/or members of human resources.  Although Ms. Wright made it clear these sexually harassing comments were unwelcome, unwanted, and needed to stop, the Company failed to take any meaningful actions to address Ms. Wright's protected concerns.

58.     Indeed, upon information and belief, the Company never reprimanded Shoemaker for his sexually harassing comments and actions.

59.     In or around mid-October 2024, less than a month after Ms. Wright informed Shoemaker that she would never sleep with him, Shoemaker suddenly informed Ms. Wright that

if she wanted to continue working for the Company, Ms. Wright would have to take a 50% pay cut and a demotion.

60.    Indeed, this demotion cut Ms. Wright's pay from approximately $12,000 per month (and sometimes more) to approximately $6,000 per month.

61.    This was clearly a discriminatory and retaliatory reaction to Ms. Wright's protected actions, and also constituted a *quid pro quo* punishment of Ms. Wright for her refusal to sleep with Shoemaker.

62.    The Company forced Ms. Wright into the demoted position at the lower pay rate.

63.    In or around late October 2024, Mike Avery ("Avery"), a sales representative, informed Ms. Wright that Shoemaker told the sales team to "not speak to [me] and to act like [I am] invisible."

64.    As such, it was clear that, even in this demoted position, Shoemaker was continuing to subject Ms. Wright to a severe and pervasive hostile work environment, and indeed seemed to be trying to make her fail or otherwise push her out of the Company.  Indeed, Shoemaker had demoted Ms. Wright, and continued to sexually harass her.

65.    The Company and Shoemaker created a severe and pervasive hostile work environment that Ms. Wright found intolerable.  Any reasonable person in Ms. Wright's circumstances would have found the conditions of employment intolerable.

66.    Importantly, other managers and employees of the Company also made sexually harassing comments and/or comments that objectified women, including comments discussing female customers and employees' appearances.

67.    On or around November 1, 2024, Ms. Wright felt as though she was being pushed out of her position intentionally by the Company.  had no choice but to resign from her position.

68.     Therefore, on or around November 1, 2024, Ms. Wright was constructively discharged.  Although Ms. Wright formally resigned from her position, this constituted a constructive discharge and wrongful termination by the Company.

69.     The illegal harassment and discrimination of Ms. Wright constituted a continuing violation that continued throughout her employment.

70.     On or around June 23, 2025, Ms. Wright timely filed a Charge of Discrimination (the "Charge") with the Maine Human Rights Commission (the "MHRC") (Charge Number: E25-0232-A) and cross-filed with the Equal Employment Opportunity Commission (the "EEOC") (Charge Number: 16B-2024-00513).

71.     On or around February 24, 2026, at Ms. Wright's request, the MHRC released jurisdiction in this matter permitting Ms. Wright to proceed in court.

72.     On or around February 26, 2026, the EEOC issued Ms. Wright a right to sue notice.

73.     This lawsuit is timely filed.

**COUNT I**

**(Sex Discrimination and Sexual Harassment in Violation of the Maine Human Rights Act, Title 5, Chapter 337)**

**Ms. Wright v. the Defendant (the Company)**

74.     Ms. Wright incorporates all paragraphs above and below as if set forth fully herein.

75.     The Company is a covered entity under the Maine Human Rights Act ("MHRA") because it was the employer of Ms. Wright.

76.     The Company, including, but not limited to, its agents, harassed and discriminated against Ms. Wright with respect to her compensation, terms, conditions or privileges of employment, because of Ms. Wright's sex.

77.     More specifically, the Company subjected Ms. Wright to a pattern of gender discrimination while she was employed by the Company, including by individuals in supervisory positions, who subjected Ms. Wright to treatment that was discriminatory against her sex (female).

78.     In addition, the Company and/or its agents subjected Ms. Wright to severe and pervasive sexually harassing comments and treatment, including quid pro quo sexual harassment and a hostile work environment due to sexual harassment.  Importantly, these sexually harassing comments and this sexually harassing treatment was done by a person with supervisory responsibilities over Ms. Wright.

79.     Ms. Wright was further subjected to adverse actions, including, but not limited to, a harassing and hostile work environment, a reduction in hours and pay, a demotion, and the termination of her employment, in a discriminatory manner because of her sex and/or because she was a woman who refused to reciprocate, submit to, or accept sexual harassment.

80.     The Company acted with malice and/or with reckless indifference to the state protected rights of Ms. Wright.

81.     As a direct and proximate result of the Defendant's violations of the MHRA, Ms. Wright has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

82.     Ms. Wright seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, reinstatement of her job with full seniority and benefits, attorneys' fees, interest, and costs.

## COUNT II

### (Sex Discrimination and Sexual Harassment in Violation of Title VII)

### Ms. Wright v. the Company

83.     Ms. Wright incorporates all paragraphs above and below as if set forth fully herein.

84.     During all relevant times, the Company was an employer under Title VII, 42 U.S.C. §§2000e, et. seq. (hereinafter "Title VII") because it employed more than 15 persons for 20 or more calendar weeks within the previous 12-month period.

85.     The Company, including, but not limited to, its agents, harassed and discriminated against Ms. Wright with respect to her compensation, terms, conditions or privileges of employment, because of Ms. Wright's sex.

86.     More specifically, the Company subjected Ms. Wright to a pattern of gender discrimination while she was employed by the Company, including by individuals in supervisory positions, who subjected Ms. Wright to treatment that was discriminatory against her sex (female).

87. In addition, the Company and/or its agents subjected Ms. Wright to severe and pervasive sexually harassing comments and treatment.  Importantly, these sexually harassing comments and this sexually harassing treatment was done by a person with supervisory responsibilities over Ms. Wright.

88. Ms. Wright was further subjected to adverse actions, including, but not limited to, a harassing and hostile work environment, a reduction in hours and pay, a demotion, and the termination of her employment, in a discriminatory manner because of her sex and/or because she was a woman who refused to reciprocate, submit to, or accept sexual harassment.

89. The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Wright.

90. As a direct and proximate result of the Company's violations of Title VII, Ms. Wright has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

91. Ms. Wright seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, reinstatement of her job with full seniority and benefits, attorneys' fees, interest, and costs.

## COUNT III

**(Retaliation in Violation of the Maine Human Rights Act, Title 5, Chapter 337)**

**Ms. Wright v. the Company**

92.     Ms. Wright incorporates all paragraphs above and below as if set forth fully herein.

93.     The Company is a covered entity under the MHRA because it was the employer of Ms. Wright.

94.     Ms. Wright engaged in protected activity under the MHRA, including, but not limited to, by opposing unlawful conduct, refusing to tolerate a discriminatory work environment, and expressing concerns regarding the harassing (including sexually harassing) and discriminatory actions improperly undertaken by the Company, and by Company employees and agents, based on Ms. Wright's sex (female) and/or because Ms. Wright engaged in protected activity.

95.     The Company unlawfully coerced, intimidated, threatened and/or interfered with Ms. Wright's exercising of or enjoyment of rights granted by the MHRA.

96.     The Company retaliated against Ms. Wright for engaging in protected activity under the MHRA, including the above-mentioned protected activities, by subjecting Ms. Wright to adverse actions, including, but not limited to, subjecting Ms. Wright to harassing and hostile work environment, a reduction in hours and pay, a demotion, and the constructive termination of her employment.

97.     The Defendant's actions were wanton, malicious, and/or oppressive.  The Defendant acted willfully and/or with reckless disregard to the state protected rights of Ms. Wright.

98.     As a direct and proximate result of the Company's violation of the MHRA, Ms. Wright has suffered and continues to suffer damages, including, but not limited to, lost

compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

99.     Ms. Wright seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, reinstatement of her job with full seniority and benefits, attorneys' fees, interest, and costs.

**COUNT IV**

**(Retaliation in Violation of Title VII)**

**Ms. Wright v. the Company**

100.    Ms. Wright incorporates all paragraphs above and below as if set forth fully herein.

101.    Ms. Wright engaged in protected activity under Title VII, including, but not limited to, by opposing unlawful conduct, refusing to tolerate a discriminatory work environment, and expressing concerns regarding the harassing (including sexually harassing) and discriminatory actions improperly undertaken by the Company, and by Company employees and agents, based on Ms. Wright's sex (female) and/or because Ms. Wright engaged in protected activity.

102.    The Company unlawfully coerced, intimidated, threatened and/or interfered with Ms. Wright's exercising of or enjoyment of rights granted by Title VII.

103.    The Company retaliated against Ms. Wright for engaging in protected activity under Title VII, including the above-mentioned protected activities, by subjecting Ms. Wright to

adverse actions, including, but not limited to, subjecting Ms. Wright to harassing and hostile work environment, a reduction in hours and pay, a demotion, and the termination of her employment.

104.    The Defendant's actions were wanton, malicious, and/or oppressive.  The Defendant acted willfully and/or with reckless disregard to the federally protected rights of Ms. Wright.

105.    As a direct and proximate result of the Company's violation of Title VII, Ms. Wright has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

106.    Ms. Wright seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, reinstatement of her job with full seniority and benefits, attorneys' fees, interest, and costs.

WHEREFORE, the Plaintiff, Christine Wright, respectfully requests that this honorable court:

    A.  Schedule this matter for trial by jury;

    B.  Find the Defendant liable on all counts;

    C.  Award the Plaintiff her lost compensation and benefits (including, but not limited to, back pay and front pay),

D.  Award the Plaintiff other monetary damages, including damages for her diminished earning capacity and injury to reputation;

E.  Award the Plaintiff emotional distress damages;

F.  Award the Plaintiff compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses);

G.  Award the Plaintiff punitive damages;

H.  Restore and reinstate the Plaintiff to her employment with full seniority and benefits;

I.  Award the Plaintiff her reasonable attorneys' fees;

J.  Award the Plaintiff interest and costs;

K.  Award the Plaintiff all other damages to which she is entitled; and

L.  Grant such further relief as is just and equitable.

Respectfully Submitted,

CHRISTINE WRIGHT

By her attorneys,

THE LAW OFFICES OF WYATT & ASSOCIATES P.L.L.C

Date:  March 26, 2026          By:      /s/ Michael R. Varraso

Michael R. Varraso
mvarraso@wyattlegalservices.com
ME State Bar: 5619291

Benjamin J. Wyatt
BWyatt@Wyattlegalservices.com
ME State Bar: 6118

The Law Offices of Wyatt & Associates,

P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1112
Facsimile: (603) 685-2868